is Saxon against Southwest Airlines Company, which is number 19-3226, and we are ready to hear from Ms. Bennett. May it please the Court, Jennifer Bennett for Ms. Saxon, the appellate. I'd like to reserve five minutes of my time for rebuttal, if I may. Just watch the clock. Will do. Over and over again, the Supreme Court has held that workers who load and unload interstate cargo are engaged in commerce. The Court said it before the Federal Arbitration Act was passed, and has continued to say it ever since. In fact, every tool of statutory interpretation we have points in the same direction here, that workers who load and unload cargo from planes are exempt from the Federal Arbitration Act. First, and most importantly, the text. You know what the phrase engaged in commerce meant at the time the Federal Arbitration Act was passed, because the in interpreting FILA, the Federal Employer's Liability Act. Ms. Bennett, in looking at the text, the Supreme Court has told us in Circuit City that for the residual clause, we have to apply the ejusem generis principle here. If we conclude in applying that principle that loaders of cargo are not seamen, but they are railroad workers, where do we end up? So the question is not whether these people are seamen or are railroad workers, but rather whether they are engaged in commerce in the same way that seamen and railroad employees were engaged in commerce. And so even if you think that people who loaded and unloaded cargo were not seamen, we know the Supreme Court told us in Puget Sound, they say longshoremen, people who load and unload cargo, are engaged in commerce in the same way as the crew of a boat are, as seamen are. And so the Supreme Court has already answered this question for us, even if you don't think that people who load and unload boats are seamen. And I do want to say that in fact in 1925, which is the relevant year under new prime, people who loaded and unloaded boats were seamen. And that's true for two reasons. Even, you know, first... Well, I know you're relying on Haverty and the Jones Act and I think that has been clear and the case law has been clear that that principle was really limited to the Jones Act and not broader. So it's, I think it's not entirely clear, but I want to put longshoremen entirely to the side. Even if you think that longshoremen were never seamen in 1925, it's very clear that seamen, who nobody disputes are seamen, people who are members of the ship's crew, were also responsible for loading and unloading the ship. So Puget Sound says this, the Minna says this, the Walsh Brothers says this. You can put longshoremen workers entirely to one side. And still, people who load and unload boats are seamen. And again, even if they weren't, we know from the Supreme Court that people who load and unload interstate cargo have the same relationship to commerce as seamen do, what it said in Puget Sound. And so, and that's the question here. Do people who load and unload planes have the same relationship to commerce? Are they engaged in commerce in the same way as seamen and railroad employees? And so seamen loaded and unloaded boats railroad employees we know loaded and unloaded trains. We have several cases for that proposition. The Birch case, for example, is where the Supreme Court expressly says that. We know at the time the Railroad Labor Board regulated the people who loaded and unloaded trains. And what the Supreme Court has made clear is you can't interpret the catch-all phrase more narrowly than the categories of which it's a part. And so the categories of which it's a part have the same relationship to commerce as people who load and unload planes. And I'd like to return. Yes, Your Honor, sorry. Eastus, the Fifth Circuit came out differently in Eastus. Is it your position that this case is distinguishable from Eastus or that we should split from the Fifth Circuit? And could I also throw a plus three into that question? If we were to disagree with Eastus, are there other courts that we would be agreeing with? In other words, is there already some kind of split in the circuits or would this be a new one? So to the first question, I think Eastus is actually distinguishable. Eastus does have dicta at the end about loading and unloading, but the worker in Eastus did not load and unload planes, did not supervise someone who loaded and unloaded planes. The worker in Eastus, what they actually did was supervise ticketing and gate agents. And so that is a much more difficult question and further removed from the flow of someone who loads and unloads planes, which is what the Supreme Court has defined as part of commerce, as part of transportation. And so while there's dicta in Eastus that arguably would go the other way, Eastus in fact examines the question that is at issue here, which is the class of workers who in fact loads and unloads interstate cargo. There's also, you know, quite intention, you know, it's not entirely clear to me the rationale of Eastus. It sort of takes this pre-Oliver attack of sort of gestalt-y Federal Arbitration Act is narrow, and therefore we're going to do the most narrow thing possible, which is what New Prime says you can't do. But that approach does conflict, but to the extent that essentially what Eastus is saying is you have to physically move goods from one place to another, that would conflict with a number of other cases. It would conflict with the Palco case. It would conflict with Bakashoa, which is a postal workers case. It would conflict with the American Postal Workers Union case. And so there's already, you know, some extent a conflict in the case law where the cases that took this textual first approach that New Prime supports have held that you don't actually need to physically cross state lines to be engaged in commerce. And that's what the Supreme Court has held over and over and over again. And so there's no real way to follow Eastus, but not create any sort of other conflict. To answer your question. I was going to comment if we could go back to in commerce. It's still the case, is it not, that the Supreme Court distinguishes the kind of regulation that's possible when a statute says something has to be in commerce versus the more broad effect in commerce that came on later? That's correct. That distinction has been the case, you know, since before the Federal Arbitration Act was passed in fact. So we're looking for a class of workers, not the employer's job, but a class of workers whose own work is, quote, in commerce. And I take it from part two of your supplemental brief that your contention is that the loaders and unloaders are, if you will, the first step of the in commerce. We don't have to reach the ticket agents here or the people who throw the bag onto the moving beltway or anything. That's exactly right. The Supreme Court has repeatedly said that this act in particular, loading and unloading, is not just a preliminary step to transportation. The Supreme Court has said this is transportation. The first part of transportation is loading and unloading a good, putting that good into the channels of commerce. And the last step, transportation doesn't end until you unload it, until you take it out of the channels of commerce. So that's Joseph, for example, and Puget Sound. And so we don't, this court doesn't need to reach any of the more difficult line drawing problems. Here it's pretty, it's very straightforward. There's a host of Supreme Court cases that are right on point that say this work is engagement in commerce. How important is it for your position that Ms. Saxon executed this affidavit or takes the position that, whatever it was, you know, three out of five days for the week, she is herself physically doing this. If she were just a supervisor standing there, would you concede that she is not a transportation worker? No, Your Honor. In fact, the Supreme Court has answered Puget Sound. What the Supreme Court said is the people who are engaged in commerce, engaged in transportation, are people who either load and unload interstate cargo, in that case it was ships, directly themselves or by servants, whether, or if they direct other people who do that cases, that too is being engaged in commerce. The Fifth Circuit's Atlanta terminal case makes the same point. And so there's no distinction between physically doing it yourself and directing other people to do it. You know, I think that because she physically does it herself, you don't need to reach that question. I think the record is clear on that point, that at this stage, the court has to accept that the majority of her work was itself physically loading and unloading goods, but it doesn't actually matter under the Supreme Court's case law here. If there are no further questions, I'd like to reserve the remainder of my time for rebuttal. All right. Thank you very much, then. And we will move to Ms. Siebert. Good morning, and may it please the court. Melissa Siebert for Southwest Airlines Co. The court requested supplemental briefing in this argument to answer two questions. How to apply together the holdings of Circuit City and New Prime to the facts of this case and how to assess case developments since we last argued before you in the summer of 2020. Ms. Saxon hasn't answered these questions today, and she doesn't answer them in her supplemental briefing. From Southwest Airlines' perspective, both of your questions are answered best by this court's own opinion in Wallace v. Grubhub holdings, an opinion that Ms. Saxon largely ignores. Wallace applies Circuit City and New Prime in a clear manner that this court can to find that Ms. Saxon is not within the residual clause of Section 1 of the FAA. Wallace follows Circuit City's analysis, which requires the court to determine whether a current plaintiff belongs to a current class of workers who are not simply connected to the goods themselves, but to the act of moving goods across state or national borders. But Wallace provides... to me critical in Wallace is that the Grubhub people had nothing to do with how the food that they were transporting got to the final consumer. It could have all been grown in an urban garden 10 feet away without any interstate commerce. So you don't have that flow of interstate commerce. We have other cases in which truck drivers are doing a leg of the trip that's purely intrastate, and yet they are part of the in-commerce. So I think you might be over-reading Grubhub. Well, if you look at what Wallace says, Wallace says you should always focus your analysis on the workers' active engagement in the enterprise of moving the goods across state lines. An example of that... So are you saying that Wallace requires us to reject all of the cases that talk about last deliveries? That would create a conflict with the Third Circuit, at least, and some others, as well as rejecting their own cases. Apologies, Judge. I did not mean to interrupt you. No, I'm sorry. I would assert, actually, that Wycotha, we're obviously talking about the Wycotha case and the Rittman case, that those cases don't involve the facts here. Those cases involve last-mile delivery drivers, as you noted, that were deemed to be akin to the interstate truckers, which this court in Keenstra and many other courts, including New Crime, have held are akin to seamen and railroad workers and are within the exemption. What Wycotha specifically declined to address was whether workers who are merely connected to the goods, not actually transporting the goods, are within Section 1's residual clause. But let me just push back on this, because if you are picking up the package and putting it onto the plane, it seems to me you are transporting the good the first leg of its trip, whether it's a suitcase, whether it's a large box that somebody's shipping. Why isn't that part of the actual movement of the goods? Well, I think we can look back to what both Wallace and Palco, for example, Palco in the footnote, where it excludes and recognizes that warehouse managers who are just supervising those who load and unload goods are not transportation workers. Well, sure. That's exactly. That warehouse, unless you're in a Monty Python movie, the warehouse is not itself moving. The warehouse is a fixed place. It seems to me one could agree entirely with those positions and still need to reach the question when the good is actually being put on the airplane, the good is actually being put on the barge, the good is actually being put in the truck or on the railroad car, why isn't that part of the I think we can answer that. I think Eastis, frankly, Ms. Saxon's counsel is reading that too narrowly. Eastis actually says, after applying the same exact analysis that you all applied in Wallace, that Ms. Eastis's duties could at most be construed as loading and unloading airplanes because they did find that she was engaged in putting baggage, ticketing baggage, and putting baggage and goods on conveyor belts to be transported to the plane for loading. But not onto the plane, right? Do you agree she wasn't the person standing at the bottom of the ramp putting the things on the plane? I would respectfully disagree for the same reason that I said last time. Ticket agents, Southwest ticket agents, are the folks that are also standing at the gate when you're there, and if you drop off your stroller or a package containing goods that's too large to go in an overhead compartment, yes, the ticket agent does take that baggage from you or that stroller from you, and it does go directly to the plane. And so I don't think you can draw that kind of line, Judge, and go with language that she's somehow connected to the goods because she's loading them. That line doesn't stop. Is it your position, Ms. Siebert, that the class of workers would actually have to move across state lines in order to qualify under the residual clause? No, I think you can find that in Palco, for example. Palco looked at the supervisors' duties, and the supervisors' duties were directing interstate trucking, right, telling people where to go and where to move goods. In our own district court opinion here, Judge Dow said, Ms. Saxon is not like a supervisor of a pilot directing pilots where to fly the plane with goods in tow, and that's directly from Judge Dow's opinion. That's the line that we're drawing here, and historically... So your line is you either have to go across state lines yourself or be directing somebody else to go across state lines? Within this analysis, yes, because what you say in Wallace is it's going to be a fact-specific analysis. I need to look at the job description of that class of workers and say, are they actually and actively engaged in the transportation of goods in interstate commerce across state lines? The answer to that here is no for several reasons, including that Ms. Saxon was found. I know Ms. Saxon's affidavit says one thing. The judge also noted that Southwest's position was to the contrary. At the end of the day... But we can't resolve this. This is a preliminary stage of this. Are you saying that this court needs to resolve a factual dispute like that? No, what I'm saying is when cases like this come to you, the Wallace framework provides that we have to do an analysis of the actual position before you. Are they within the class of workers? Are you saying that ramp supervisors would be treated differently than ramp employees? So the cargo, those actively loading the cargo, is it your position that they would qualify but the supervisors wouldn't? No, that's not my position. That's not my position. Then why does it matter then if your position is that they both wouldn't qualify? My position is that Ms. Saxon doesn't qualify. And what the district court found is that she... Don't we look at the class of workers? It's not Ms. Saxon. And Wallace reiterated that very clearly. It's not Ms. Saxon and whether or not she qualifies. It's the class of workers. That's what the residual clause is. Right. Is the class of workers supervisors or non-supervisors? I do believe that supervisory duties are important here. Important because Judge Dow actually held that while she loaded Ms. Saxon and unloaded some cargo, she supervised those who did. That had to do with whether she was manipulating the channels of commerce. So in other words, she's not a supervisor. And that's not how I read what Judge Dow found here. He found her affidavit uncontroverted by you. But go ahead. I'm sorry, Judge White. I didn't mean to interrupt you. No, no, no. It's important because first of all, obviously we are here to review what Judge Dow said and everybody has the greatest respect for him. But there's a broader question here. And one of the questions as Judge St. Eve was saying is, is there some distinction in your view between the supervisor and the actual person doing the loading? If there is such a distinction, it might matter how much she's loading. I think I read Judge Dow as accepting for the purpose of this phase of the case of accepting her affidavit. And he understood the law to be different. So we're looking at the law. And the law seems to boil down to what did the FAA mean in 1925 when it adopted this conception? New Prime says, you've got to take the good with the bad. You've got to take both the pro-arbitration line and the compromises, as the court put it, that went along the way. And does that meaning encompass people who are engaged in first step and last step activities, loading at the one end and unloading at the other at a class level, just as Wallace said? Yes. And I can address that. What I would note, and then I'll answer that question, is that in Appendix 13, what Judge Dow actually found was that plaintiff's job duties at most include loading and unloading some cargo from defendants' planes along with supervising that which all concluded that warehouse managers who load and unload cargo and generally manage logistics were not transportation workers. He found that Ms. Saxon was not a transportation worker. But not because she was a supervisor. To the extent you're arguing that his ruling was based on the fact that she was a supervisor and didn't perform ramp agent duties, footnote two of his opinion specifically says that her affidavit is uncontroverted and even the materials that defendants had submitted showed that she may perform ramp agent duties. It says the court assumes she has done so for purposes of this motion. That's a footnote. So to the extent your argument is based on the distinction between being a supervisor and a ramp agent, I don't think that succeeds given the the ruling here. Understood. You've asked me also what about historical context. Is she akin to a seaman or a railroad worker? And the focus there should be on Wielander. You might also throw Birch into your discussion the year before the FAA was enacted. Okay. Wielander notes that at the time of the Osceola, which was a 1903 decision, and the passage of the Jones Act in 1920, general maritime law did not require navigation, but it was necessary that a person be employed on board a vessel in furtherance of its purpose. And so Ms. Saxon's claim that land-based workers or maritime workers were intended to be included within the Jones Act or within the term seaman in the 1920s is simply not correct. Wielander went on to note that Congress repeatedly attempted to clarify, both immediately after International, Steve carved land-based workers out of the Jones Act, and again in 1972 when they amended the Longshore and Harbors Workers Act to bar land-based workers from receiving certain recoveries available to seaman. What Ms. Saxon is asking you to do here today is what Circuit City has cautioned us against doing. We should not amend Section 1 by judicial decision rather than a mandatory legislation. Congress has had many years to add certain airline workers to the enumerated list. It has chosen not to do so, and the list cannot be expanded via the residual clause, nor should it be expanded when the history of seaman historically, according to Wielander, which also analyzed merge, included those on board the ship in furtherance of its purpose. Could you do the same analysis for railroad employees? If we agree with you about seaman, they're not the only ones mentioned. Railroad employees are as well. Yes. The new crime mentions the Erdman Act. The Erdman Act defined a railroad employee as one actually engaged in train operation or service. That's a contemporaneous statute, if we're going to get readings of what a railroad employee would be. And Ms. Saxon concedes that railroad workers have never included all railroad employees. For example, we know they've never included office clerks. But when you look at is one actually engaged in train operation or service, that would be someone driving the train akin to or supervising those who do, akin to the pilot seaman involved, some active involvement. Now, your time is up, so you're going to need to finish. The district court's decision in Southwest's favor should be upheld. This court should not apply inapplicable case law, including FEWA, to interpret the residual clause. It should use Wallace as guidance to find that Ms. Saxon is not a transportation worker within the residual clause. The district court's findings should be upheld. All right. Thank you very much, Ms. Siebert. Ms. Bennett, you have five and a half minutes. So to answer your last question about railroad employees, Southwest cites the Erdman Act and doesn't cite, first of all, the Erdman Act had long gone away by the time the Federal Arbitration Act was passed. What new prime relies on is the Transportation Act of 1920. That's what was in force at the time. But Southwest doesn't cite anything that interprets that language from the Erdman Act. So even if we're going to go on the Erdman Act, that doesn't help us. It doesn't tell us what railroad employees were. But we know what railroad employees were at the time of the Federal Arbitration Act was passed because we have the Supreme Court's decision in Birch, which says this guy who loaded and unloaded a train, that's a railroad employee. That's a year, I believe, before the Federal Arbitration Act was passed. We have dozens, if not hundreds, of Railroad Labor Board decisions, which are decisions that the Supreme Court in new prime relied on to interpret the Federal Arbitration Act. And those decisions all say that people who load and unload trains and who handle baggage on trains are railroad employees. So every all of the evidence we have from the time, and it's the same evidence that the Supreme Court relied on in new prime, all of that evidence shows that people who loaded and unloaded trains were railroad employees. And similarly, even putting longshore workers to the side, we have a bunch of evidence that shows that people who loaded and unloaded boats, if they were part of the crew, were seamen. And again, we have the Supreme Court's decision in Puget Sound saying even people who aren't seamen who load and unload boats are engaged in commerce in exactly the same way. And so if we're going to interpret the statute consistent with these categories, as Circuit City tells us we must, we have to take what the connection between these categories is seriously. And both categories, seamen and railroad employees, loading and unloading was a form of being engaged in commerce. And that makes perfect sense because the Supreme Court has repeatedly said that is transportation. And so if you're engaged in loading and unloading, you are engaged in commerce itself. You're engaged in the first step of transportation. So I take it just to clarify, because we need to be careful not to go down the slippery slope that Southwest warns us about. When you say loading and unloading, are you excluding acts preparatory to the loading and unloading, like checking in the bag, or putting a sticker on, or taking something from the warehouse to the means of transportation, whatever it is? Where's the line? So I think there are, you're right, I do think there are difficult line drawing problems. And it's not clear to me that every act before loading and unloading would be excluded. I think you'd have to go through the same analysis, which is to say, is this person physically moving goods across state lines or doing something that is practically a part of it? And are they doing something in the same way? Are they engaged in commerce in the same way as seamen and railroad employees? So for example, there are old cases that talk about how baggage is in commerce. It's in transportation once you give it to the company that is going to transport it. So it may very well be that you could hold that once the cargo or the baggage has been taken, both the person who put it on the plane and maybe the person who gives it to the person who puts it on the plane, maybe they're both engaged in commerce. That's a hard question, but it's not an issue here. Here, it's very clear that at the very least loading and unloading counts. And we have a ton of Supreme Court decisions that say that. I'll also note that Southwest's approach, which as far as I can tell is to sort of look at a hodgepodge of cases and maybe footfall analogies doesn't solve any of these line drawing problems. Southwest's argument is really, you can't look at what the meaning of the statute was at the time. You can't look at the conflicts this will create with current statutes, such as the Railway Labor Act. You can't do what the Supreme Court tells us to do, which is look how the Supreme Court has interpreted the same language in other statutes. And none of disabling the court from doing that doesn't make the line drawing any easier. It doesn't make that problem go away. What it would do is remove all the tools we have to come up with a principled approach to that line drawing. And instead, what we should do is do what New Prime and Circuit City tell us to do, which is look at the language. What did it mean at the time? How were seamen and railroad employees engaged in commerce? And would this create a conflict with other statutes at the time? And all three of those, all of the ordinary statutory tools of interpretation point in the same direction here, which is that workers who load and unload cargo from planes are engaged in commerce and exempt from the Federal Arbitration Act. If there are no further questions, we'd ask that this court reverse the district court's decision. All right. Thank you very much. Thanks to both counsel. The court will take the case under advisement.